In this case, on the docket, 2-18-0375, City of Aurora, Columbia, California, the Association of Saskatchewan Police Officers and manual laborers, defendants and felons. Arguing on behalf of the defendants and felons, Mr. Tempe B. O'Neill, arguing on behalf of the police department, Mr. John B. O'Neill. Mr. O'Neill, you may proceed. Thank you, Justice DeClaren. Good morning. Good morning. I was hoping, good morning, Mr. Murphy. I was hoping I could agree to the Bears' victory Monday today, but instead... Oh, is that like the worst possible ending ever? To be honest with you, Your Honor, I was hoping that Rodney Gould was there or Kevin Butler or even Justice Thomas was there. Anybody but that guy. All right. I feel your pain. This case, before you, about the sanctity of a bargained, collective bargaining agreement under the Illinois Public Labor Relations Act and the extreme difference given to an arbitrative decision upon rendering his or her award. We do review at this stage the arbitration award, not the trial court's decision, and that judicial review is extremely limited of the award. The question is, did the arbitrator act within the scope of his authority and whether the award drew its essence from the collective bargaining agreement? That's the SB1 case. SB2 stands for the proposition that the parties have agreed to the arbitrator to accept the arbitrator's interpretation of the collective bargaining agreement, and that construction must not be overruled, even if the court's interpretation differs from the arbitrator's. The arbitrator in this case framed the issue of the case as the following. One, was the grievance discharged a just cause? Two, what is the appropriate remedy? Under the just cause element, the union admitted that the city had just caused Discipline Officer Wagner. He committed rules violations, and the union's position was that because of his past service, his lack of discipline, that he should not be terminated. Despite what was placed in the briefs, Officer Wagner did testify in the sense that he gave a compelled interrogation under Gary v. New Jersey. That was introduced by the city into evidence at the arbitration, and if you want to look at that, it's kind of long, but he was also remorseful before. The hearing officer or the arbitrator made some comments about credibility of your client because he never testified in front of him, is that correct? He did not testify at the arbitration. But there were words that he made in interrogations and reports, were they not, that were submitted into evidence? Correct. By the city. So there were, in fact, statements made by your client in the record. Oh, absolutely. They were introduced by the city. And he was compelled under Gary. Apparently the arbitrator felt you can't make a determination of credibility based upon whether or not it's plausible, consistent, and possibly against one's interest? That's what apparently he did. Pardon? Apparently he did make that determination. Even though the hour and a half long interrogation was in the record. Is it possible to make credibility determinations based upon evidence other than testimony held in court? Yes. How so? Well, in this case, then-Sergeant, now-Sheriff Ron Hain testified as to the officer's credibility, good work performance, and reliability. Chief Zeman testified at the hearing that he was a good employee. But yes, she felt compelled to terminate him. The hearing officer made a determination, in fact, defining that the ex-wife did not make use of the eavesdropping devices. He did. And I believe it was the evidence of lack of consent was testified to by Mr. Hain? I don't recall. Well, how did-if she didn't cooperate, then how was it that anything other than hearsay  There were the very limited consent issues where, I believe in the interrogation, Officer Wagner was asked if Lisa knew about the devices. Other than that, there was no testimony as to consent or lack thereof. So it was essentially established by an admission of your client, or a statement of your client against the jury? Right. Rather than hearsay from some third party? Correct. Thank you. The second part of the issue framed at arbitrator after just cause, which the union admitted the city had caused to discipline Officer Wagner, is the remedy. And in this case, the arbitrator wrote that the remedy needs to be severe enough that grievance and the police community know that the behavior is not accessible. But also that it needs to take into account the circumstances surrounding the grievance breach of the law. He pointed out that Wagner was a nine-year veteran with, quote, good work evaluations for his past performance. He was, quote, going through a difficult divorce, and his emotions may have clouded his judgment. Based on that, arbitrator lashing, letting a one-year suspension, which is substantial. Your opposing counsel filed after his brief, the conclusion of which only asked for affirmation of the decision. It doesn't ask for any other relief that might be just and equitable. The last paragraph of that brief also states that it would not be productive to remand for anything or any purpose. What is your response to that claim? Well, we have alternative requests for relief initially to affirm the arbitrator's award. But in the alternative, I believe eight days after the award was issued, we filed a motion with the arbitrator to clarify the award, to answer some of these questions about credibility and recidivism. That was filed on Monday, I believe, January 15th. The following Thursday, the city filed a complaint in the circuit court which deprived the arbitrator of jurisdiction to answer those questions or to decide those questions. Do you think it's implicit that the arbitrator took into account the lack of evidence of recidivism? In other words, you're implicitly concluding there was, there's a very small likelihood of recidivism. I believe so, because he talked about his good work record. He talked about his cloud adjustment going through a difficult divorce. I think that was implicit. So the arbitrator doesn't have to say in so many words, I considered A, B, and C, and therefore conclude low likelihood. The Displains case discusses that. There, I don't think the arbitrator made any implicit or explicit statements. In our view, he analyzed the evidence. We asked for the 15-day suspension that Commander Doors had recommended. The city asked for termination. The arbitrator issued a one-year suspension with loss of seniority, with loss of pension credits. It's a substantial penalty. I think he addressed the seriousness of the rules violations and he handed out an appropriate penalty. Does there need to be an explicit finding, though, as to recidivism or rehabilitation? Really? Because you actually, that was your motion, right? It was. I was anticipating that becoming an issue. I guess I'll answer your question, Your Honor, this way. Would it have been better if he says, as Justice Jorgensen said, I've considered A, B, and C. In the totality of all of this, I find that he's not likely to repeat this conduct. Absolutely, it would be better. There was no evidence indicating that he had remarried and was in the process of another divorce, is there? That the officer had remarried? Well, if we're talking about recidivism, we're talking about a scenario where he ends up getting married and divorced again, unless he's going to do some different eavesdropping in a different factual scenario. There was no evidence of that. In fact, Officer Wagner's sitting right there and I can tell you he has not remarried, even to this point. Okay, well, I don't know that we can take judicial action. I know that. It's in the left and he's in the right. Continue. So, your position, then, is that the arbitrator did make implied findings, in a sense, right? Yes. Is that sufficient? I believe in this case it is. This is an unusual case, as far as the violation of statutes and so forth, the bad conduct, let's say, in that it was presumed that he had remarried. Particularly directed at, you know, one particular person. But taking all that into consideration, is that really sufficient? The arbitrator's findings? Well, lack of findings, but impliedly so. Well, of course, I'm going to say... And is there any authority? Let's put it this way. Is it sufficient and do you have any authority that would indicate so? I don't have any authority, Your Honor, because, as you said, this is a case that's in between several lines. But he did write, after he said, after I gave due consideration of the evidence and the testimony in this case. He talked about the good work record. Nine-year veteran. The cloud of judgment going through the divorce. And there are no questions of judgment. Put another way, is a finding regarding recidivism a sine qua non which requires remand? There is no authority to that, Your Honor. Either way? No. No, you're supposed to say yes, right? Well... When I said either way, that means there's no authority that says that you have to or that you don't have to. Correct. Correct. Yes. Therefore, it would be yes. Yes. I'm still thinking about that ball going off the upright. Did the hearing officer or the arbitrator make any reference to the lack of cooperation of the ex-spouse and the possibility or probability that she and her children would be detrimentally affected by a termination? To my recollection, he did not address the lack of cooperation. In fact, the union introduced the search warrant that had to be issued as evidence that she didn't want to have anything to do with this but there was no testimony. The arbitrator did make as he called it, an assumption that it would be more favorable for her and her children assuming that there was child support entered into the divorce decree which also was not entered into evidence. No, but there's testimony apparently when he was either talking to Ainge or texting with Ainge saying that if I lose my job, there goes child support. Do you remember that? I don't remember the part about child support. I honestly don't. I don't recall that at all. I am very familiar with the text messages. Yes, Your Honor. Well, I'm not sure it was a text message. It could have been an oral conversation. No, I think primarily that was the evidence that it was a text message between now Sheriff Ainge and Officer Wagner. If we don't have any questions, sit down. Can I just finish real quick? Sure. The contract allows for progressive and corrective discipline which includes rubber bands, suspensions, and termination. Under the common law standard that's applied to these cases, the courts must enforce the award if the arbitrator acted, one, within the scope of his authority and two, if the arbitrator's award draws its essence from the party's collective bargaining agreement. In this case, it's our view that the arbitrator did find mitigation and he derived a remedy, a one-year suspension, directly from the CBA. He's allowed to issue anything from a rubber band, which of course we never thought about asking for, through suspensions up to termination. He looked at the agreement, he looked at the circumstances, he thought that a one-year suspension was a sufficient remedy. There are no Brady versus Maryland issues in this. There are no Gabriel versus United States issues in this. Our position is we have to uphold the essence of the contract that the arbitrator relied upon and found. What do you mean by saying that there's no Brady issues? There's no untruthfulness. There's no adjudication that has to be disclosed. I would expect that if Officer Wagner was involved in following the arrest of a cocaine dealer that the defense attorney would subpoena his personnel file. And of course, this was a public record. It was all over the degree. Great paper. Any other questions? Thank you. You may make rebuttals. Thank you. Mr. Murphy. Good morning, Your Honor. I'd like to start by revisiting this so-called recidivism issue and implied findings being either made by the arbitrator or being necessary as a sine qua non without which this court can't make the public policy determination. This court and all of the courts considering these kinds of issues indicate that it's a fact-specific injury. To say that if somebody who has engaged in the horrible, horrible conduct at issue in this case should get his job back because he says, well, now that I've been caught after having spent months peering into my ex-wife's bedroom from a phone device looking at her most intimate activities, I promise I'll never do it again. That that should be considered as a vehicle for letting somebody back to work is, in our mind, a concept that this court should reject. What about the fact that she apparently didn't want to cooperate, which would suggest that as far as she was concerned, the benefits of prosecuting Mr. Wagner and terminating his employment was not in her best interests? That is a, that of course is speculation based on the facts. Well, your response should have been, I'm not concerned about her interests, I'm concerned about the police department's interests. That was maybe the second half of it. But that, but on a record basis, the, there's nothing in the record one way or another. But the interest that we're talking about here is not the interest of Lisa Wagner in child support. The interest is the public interest. That's the essence of the public policy exception to the rule. The public cannot, the public interest does not serve by bringing back to work somebody who has engaged serially in conduct that could easily be viewed as criminal. What's the specific public policy that was violated? The, several public policies. The policy favoring the interest of privacy. As the Court knows, we look to the Constitution, we look to statutes, and we look to case law. Our Constitution specifically speaks in terms of the right to privacy. State Constitution? Yes, the Illinois Constitution specifically says, it goes far beyond the Fourth Amendment context, it specifically says there's a high public interest in the right to privacy, including protection against electronic communication. That certainly is a strong public policy. There's several statutes prohibiting electronic surveillance, eavesdropping and the like, exactly the kind of things that Wagner engaged in. And of course, there's case law protecting the right to privacy. We only look at Prosser for that, but there's plenty of cases dealing with invasions of privacy of this nature. The Circuit Court also alluded to the fact that our police officers obey the law. They are the custodians of the law. They are society's witnesses. And if a police officer falls off the rails, not once, not twice, but dozens, scores of times. You're counting, what, every day, every minute, every hour? When you say serial, you're counting what? Because it's not a case of this victim, let's say, and that victim, and a serial case in the sense that there were multiple victims. I'm saying that each time he peers into that human being's bedroom, that was a separate tort. That was a separate invasion of privacy. That's what I'm referring to as serial, multiple times. The additional public policy is that we must have our police officers not committing crimes, not engaging in such outrageous conduct, and then putting them back on the street. So, Your Honor, I think those are the three public policies. I'm sorry, I only have two. Privacy, officers obey the law, what was the third? Oh, I said the three prongs of privacy. The Constitution, statutes, case law, and the other public policy articulated in many cases that police officers need to obey the law religiously in their private lives. So those are the public policies. If I can maybe put this issue of implied findings. If the conduct is truly outrageous, then it becomes a question of law for this court to determine the public interest and whether the public interest requires termination, regardless of any findings made by the arbitrator. As I mentioned, the notion of recidivism in the setting is absurd. Justice McClaren talked about that in terms of a hypothetical second marriage. I mean, if somebody engages in rape, they don't get the job done by saying I'll never rape anybody again, or this person again. That's ridiculous. That's what the case is called, a drunken pilot scenario where the courts have said regardless of track record, regardless of prior history, if somebody has engaged in truly outrageous conduct, the public requires that that person not come back to work. Just that simple. Is the public endangered by this or just I guess the person that at one time you cared the most about? The public is harmed by having somebody who has engaged in this type of misconduct return to work. Is it public trust? It's public trust. It's the ability of a law enforcement agency to say we will not tolerate abuse by our officers. That kind of brings me to the Decatur case, which in our view is very close to this case. That was a highly decorated officer. He engaged in two episodes of domestic violence and lied during his interrogation. This court said that we can't tolerate that. The public policy against domestic violence is so strong that we cannot allow somebody like that to carry the badge and represent society as a police officer. In that Decatur case, I know that there was a previous discipline for a domestic battery with a 30-day suspension, but how far apart were those two incidents? I don't believe the appellate court said that. It didn't get into that date. But certainly we concur with the circuit court that what happened in this case is much more egregious than what happened there. To be sure, any act of domestic violence is horrible. But when we think about what happened in this case, time after time after time... Does it matter that there was a prior event in the Decatur case? There was a domestic violence. He was reprimanded. A remedy, a punishment was imposed, and then he did it again. As opposed to here, albeit that the violations were ongoing and occurred multiple times over a long period of time, but there was no intervening discipline taken. Yes. Shouldn't the arbitrator... Isn't that something that the arbitrator was almost obliged to consider? No. I don't believe that the fact that in Decatur there was a passage of time... You're already talking about things like progressive discipline. That doesn't apply in a case of where the conduct is truly outrageous. We can't... You're saying under the collective bargaining, progressive, blah, blah, blah. But if you do something so outrageous, that is set aside and you can impose a harsh remedy or discipline because the conduct is outrageous. That's the so-called skipping steps. As we say in the public labor context, you don't get a reprimand for your first murder. Got it. You got any authority for that? Well, Decatur has authority for it. There's a second one. The... And I think if you commit to murder, you're probably going to be in a penitentiary, so it's going to be hard to wear a uniform. The DeWitt County case, which neither party cites, speaks in terms of overturning a case based on public policy where the appellate court said you don't get a free strike at another human being. So the... Justices, to answer that question, the seriousness of the conduct... But that free strike, that was a physical altercation? Yes. Okay. Yes. To be clear. Yes, that was a physical altercation. But nothing in our view compares to what happened in this case because of the seriousness of it. The appellate court or strike that the arbitrator didn't make any implied findings because findings have to be based on fact. Wagner chose not to testify. Wagner didn't introduce, didn't say to the arbitrator... Excuse me. Do you mean Lisa Wagner or the police officer? Officer Wagner. Excuse me. Mr. Wagner. He chose not to testify in his proceeding. So that left the arbitrator to speculate as to why he didn't testify, what might happen again. But you can't have implied findings of fact when there's no facts upon which to reach a conclusion. But the arbitrator did have facts. He certainly could have had more, but the arbitrator had his prior record, had the lack of prior discipline. That's a fact. Now, the question then becomes did the arbitrator ignore his, I assume it was a he, his role in reviewing the facts and entering his decision in the essence of the collective bargaining agreement? There was stuff there. Oh, certainly. There was stuff there and the arbitrator found that among other things that you can't allow a police officer to break the law. Which pivots us back to public policy, which is for this court. So we've got an undisputed set of facts. We have admitted horrible misconduct. We also have admitted in the interrogation, we also have admissions of knowledge of this horrible conduct in the text message stream that is on page two of our brief, where as you'll, as the court will recall, when Mr. Wagner realized that everything was hitting the fan, he was launching all these text messages trying to avoid the consequences of his misconduct saying, eavesdropping, committed, I know I committed this offense, I'm going to get fired. So we've got undisputed facts of knowing misconduct, admitted repeated misconduct and therefore it's not like in preparing the unreported opinion that you spent a lot of time trying to make sure that this public policy exception is not used to backdoor fact problems. This is not that case. The facts are undisputed. The arbitrator found repeated malfeasance, as he called it, without the consent of the individual. And so where we cross the line is the pure question of law as to whether or not keeping this person in the police department in light of all of this undisputed admitted misconduct violates public policy. And if keeping the officer in Decatur violates public policy, we believe that keeping this officer on the force in light of this particular continued misconduct would also violate public policy. I'm not sure if Mr. O'Neill actually affirmatively said this. I will assume he did and ask you do you agree with him relative to the fact that once you filed the complaint in the circuit court that the arbitrator who had, I believe, a motion pending before him lost jurisdiction to consider it? I believe that's the law. That the filing of the suit divests the arbitrator of jurisdiction. That's what he concluded. And but to remain Well, that's what he concluded. And do you agree? I believe that the filing of the suit divests the arbitrator of the ability independently to consider or to conduct a supplemental proceeding. Absent When you say independently, what do you mean by that? Absent an order from the circuit court. So the circuit court could have said on the day I thought it might mean sui sponte, meaning that nobody did anything but he decided to do something on his own. I think the circuit court had the authority to do that. He declined to do that. But beyond that, the arbitrator would not have the authority now once the matter is before the court. I have a question. You know, police officers go through divorces all the time. No different than any other walk of life. What ramifications would a termination here have on domestic relations in terms of divorce proceedings for other police officers? I have the occasion to read a lot of transcripts of divorce cases where eavesdropping is used on cell phones, on answering machines, on all kinds of somewhat invasions of privacy. So what are we saying to people who go through a divorce that we really don't hold anybody else to? I appreciate that question because the answer is Officer Murphy, you know better. You have superior knowledge of eavesdropping. So we would hold them to a different standard in an arena that has nothing to do with their profession. Yes, and that's what I believe the appellate court cases that are cited in our brief teach that police officers by virtue of their power, authority, and knowledge are not the man on the street. And assuming that what he alleged was true, that this was done because she had threatened to fabricate claims relating to criminal acts that were to be or had been committed by him that would also result in his termination was a situation that he was incapable of remediating in any way, shape, or form. I don't do divorce work, but two answers to that I believe. First... Maybe you should. This public sector stuff, it's a form of divorce work, I guess. I guess two responses. You ask your lawyer what to do, and I doubt a lawyer would suggest anything illegal, but the key aspect of this case factually is that he turned the stuff back on after the divorce. Please recall that when divorce was pending, he installed the stuff, I have to protect myself, and so forth. It was March. That was March. Divorce was completed. The equipment is still in the house. In July, he reactivates it. So, the exact... Justice Jorgensen, I guess to answer your question, the exaggerated emotions that arise in a divorce setting were over. The case was done. She was a stranger to him insofar as divorce was concerned. This was an ex-wife... I'm sorry. What do you mean by stranger? Well, in my mind, no different than any other human being who was subject to... Well, I thought I read that he still did things around the house and still frequented the premises occasionally, such that he would have had to been a very strange trespasser. Well, that's correct. That's also what tipped off the wife, that he would come to the house at times when they were talking about, we're going to be doing something, or she was going to have another friend come over. But the overarching point is that to respond to the divorce-angst argument, the divorce was over, and he made a conscious decision to reactivate the spy equipment so he could look at her on the cell phone. The public interest, Your Honor, requires that when this type of conduct occurs, we can't put that officer back on the street. Did I read that this was virtually a daily thing? Yes. In the course of his interrogation, he admitted he did it frequently, not only on his personal cell phone, but he was also able to access the app on his Aurora Police Department cell phone, and he said he did that. I mean, can you imagine? Sitting in the squat car, sitting anywhere, looking? I don't know what he was... Is that phone subject to inspection by the police department, since it's their property? The APD phone would have been. But of course, he admitted it. So there was... Well, it doesn't sound like it's the most brilliant call to do so. If, in fact, his private phone is less apt to be inspected than his police phone is. Certainly, I can't comment on that. But it... There's a lot of strange things about this. There's a lot of strange things about this case, but the ultimate issue from our perspective is given all of this, the arbitrator violating, keeping this officer on the policy under Decatur and the other cases. And I thank the Court for that question. Mr. O'Neill. Just a couple of things. Yes, the Aurora Police Department did seize the phone. There was no evidence taken from the phone introduced at the hearing. There's no evidence that it was, as Mr. Murphy stated, dozens of times, scores of times. They never introduced any evidence into the record as to how many times it was accessed. Well, did he indicate how many? Yeah, he... Officer Ryder? Oh, yeah, he said frequently. Frequently or daily? He said frequently. I believe. Because if it's daily, you're talking about from July, minimum July to September, you're talking at least 60 or 70 times. He moved out of the house due to divorce July 7th, and this incident was Labor Day weekend. So it's approximately 60 days. But again, the city had the burden of proof, and some of these things are just not supported by any of the evidence. Not that they really matter to the arbitrator. I do want to talk about the Decatur case. As all of you pointed out, those are two graphic issues of domestic violence. And in and of itself, in my view, that's enough for termination. But the Fourth District went on even further. Quote, it undermines the public confidence of police departments by requiring the continued employment of officers who fail to tell the truth during investigations surrounding their own conduct, yet expecting that others facing such investigation will be truthful. There's no allegation in here. He was never charged for being untruthful in his interrogation. Actually, his commander, Dorseth, whose recommendation was introduced into evidence by the city, found that Officer Waggoner was, quote, a very forthright. There's no accusation that he was ever untruthful, evasive, that he stepped up to the plate and did the issue. If you read the end of the interrogation, he expresses remorse, says, I'm sorry. This will never happen again. Now, the arbitrator didn't mention that. But that is in the record. That was Well, isn't there an implication here that the one device that was installed in the kitchen, the refrigerator, certainly that might substantiate his statement that he did this for the protection of the children and all of that kind of stuff. But the two devices in the bedroom, that would tend to contradict, impliedly contradict his statement. Quite frankly, I don't know if this is from the record or from my own personal conversations with Officer Waggoner. I believe it's from the record. I believe he told Lieutenant Weeks that they would argue in the bedroom so it wouldn't be in front of the kids. That's why they were placed there. But I'd have to look at the record. I believe he said that in his interrogation. It could have been in conferences that we had between the two of us. We're not trying to minimize the conduct at all. Never have, never will. No, but when you're saying that he was entirely truthful and not evasive and that kind of stuff, there's a little wiggle room there, it seems like, perhaps. Well, Your Honor, there always seems to be a wiggle room somewhere, but yeah. But even his own command director would call him, quote, very forthright. Why isn't this a violation of corporate policy? Well, it could be. It could be. We're not arguing that it is, but is the remedy entered by the arbitrator a violation of public policy? That's the question. I don't think it is. He drew it from the essence of the contract. He felt that a one-year suspension based upon the officer's good record was an appropriate remedy. The remedy has to also be a violation of the public policy, of some well-identified public policy. That's all I have. If you have any more questions, thank you for your time. It's a long time until August. One point of clarification. When the arbitrator came down with the one-year's judgment, was that before or after the effective date? Because he said it's effective as of the date of termination, I believe, or whatever. And then he rendered his decision somewhere around the 8th of January or the 18th. So, my only clarification of what I'm trying to get at is, when he rendered his judgment, the time had already been served. All but the last 13 days. All but the last 13 days. That's why he included the agreement may return to work on January 18th, 2018. That's on the last page of it. So, yeah. He issued it on January 5th. There were still 13 days left. Thank you. Court's adjourned.